IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

**STATE FARM FIRE & CASUALTY CO.**
**a/s/o CHRISTOPHER and KAREN CRICHTON**
**203 FRANKLIN COURT**
**NORTH WALES, PA 19454**

  **Plaintiff**

  **v.**

**SLOMIN'S, INC.**
**125 LAUMAN LANE**
**HICKSVILLE, NY 11801**

**and**

**HORIZON SERVICES (PA) LLC**
**900 ADAMS AVENUE**
**AUDUBON, PA 19403**

  **Defendants**

Civil Action No.:

## COMPLAINT

Plaintiff, State Farm Fire & Casualty Company a/s/o Christopher and Karen Crichton ("Plaintiff"), by and through undersigned counsel, complains against Defendants as follows:

### PARTIES

1.  Plaintiff is a commercial entity organized and existing under the laws of the State of Illinois, having its principal place of business at One State Farm Plaza in Bloomington, IL; at all times relevant hereto, Plaintiff was duly authorized to engage in the business of providing homeowners insurance in Pennsylvania.

2.  At all times relevant hereto, Plaintiff provided homeowners insurance to Christopher and Karen Crichton (hereinafter "subrogors" or individually "Mr. Crichton" or "Mrs. Crichton") in connection with their real and personal property located at the above-captioned

address (hereinafter the "subject property"), under a policy that was in full force and effect at all times relevant to this action.

3.      As a result of claims made on said policy, Plaintiff became subrogated to certain rights and interests of the subrogors, including the claims giving rise to this action.

4.      Defendant Slomin's, Inc. ("Slomin's") is a New York corporation registered to do business in Pennsylvania; its principal place of business is located at the above-captioned address.

5.      Among other services, Slomin's provides heating-oil delivery and heating-system analysis/maintenance/repair to domestic customers in several states, including Pennsylvania.

6.      Defendant Horizon Services (PA) LLC ("Horizon") is a Pennsylvania corporation with a principal place of business located at the above-captioned address; it too provides heating-system services to domestic customers in several states, including Pennsylvania.

## JURISDICTION AND VENUE

7.      Jurisdiction is based on 28 U.S.C. §1332(a)(1) as this action involves a controversy between citizens of different states. Moreover, the amount in controversy exceeds the jurisdictional threshold of this Court (exclusive of interest and costs).

8.      Venue is proper in this district based on 28 U.S.C. §1391(a) in that the events giving rise to this claim occurred within this district.

## FACTS

9.      In July of 2013, subrogors purchased and moved into the subject property.

10.     The subject property contains a furnace powered by home-heating oil that is stored in an approximately 275-gallon tank designed for that purpose; both the furnace and the tank are located in the subject property's basement, with an exterior fill pipe allowing the tank to be filled from the outside.

11.     On or about February 10, 2016, subrogors hired Horizon to inspect subrogors' entire residential oil-fired heating system pursuant to Horizon's "Service Partner Program," for which subrogors paid $299.

12.     The "Service Partner Program" provided in part:

**Ongoing Safety Inspections**. Your peace of mind is our goal. We will assess your home's plumbing, heating and air conditioning systems to ensure they're in safe operating condition. You'll receive a detailed report of our findings, and we'll explain any concerns. We'll alert you to potential emergencies before they become disruptive problems. We'll even call to schedule your appointments so you won't have to worry about it.

*See the 2/10/16 Horizon Service Contract attached hereto as Exhibit "A."* (original emphasis included).

13.     As a result of Horizon's inspection of subrogors' heating system, subrogors were informed of the following:

Description of Work:

Removed 6 dead birds from flue collector, found cut wires, part missing on central box + heavily rusted heat exchanged, has abandoned humidifier.

...

**RECOMMENDATION**:

Replacing 50 yr old oil furnace as soon as possible, very poor condition.

*See Exhibit A (original emphasis included).*

14.     Horizon provided subrogors with two options to resolve their deteriorated heating oil system: "replace heavily rusted heat exchanger if avail??," at the cost of approximately $3,300 - $3,800, and installing an entire new oil furnace at the cost of $7,000 - $10,000." *See Exhibit A.*

15.     Subrogors chose the latter, more complete – and more expensive – option.

16.     On or about February 19, 2016, subrogors signed another Horizon contract for the installation of a Lennox Model ELO183 oil furnace at the cost of $8,853. *See the 2/19/16 Horizon Replacement Contract attached hereto as Exhibit "B."*

17.     On or about February 22, 2016, Horizon provided subrogors with a checklist indicating all of the steps Horizon took to inspect and replace portions of the subject property's heating-oil system. *See the 2/22/16 Horizon Checklist attached hereto as Exhibit "C."*

18.     Among the steps taken by Horizon were inspection of the supply lines connecting subrogors' oil tank to the furnace itself. *See Exhibit C, No. 3* (indicating "Gas piping/oil lines completed and leak tested [...] Complete √")

19.     During Horizon's inspection of subrogors' entire heating system, its replacement of subrogors' furnace, and its subsequent inspection of the lines connecting the oil tank to the furnace, employees from Horizon either inspected or had reason to inspect subrogors' oil tank to ensure that it was "in safe operating condition," per Horizon's "Service Partner Program." *See Exhibit A.*

20.     At no point did anyone from Horizon communicate anything to subrogors that suggested their oil tank was deteriorated, was vulnerable to leaking, or should be replaced.

21.     In early December of 2016, Mr. Crichton met twice with a door-to-door sales person named "Angel," employed by Slomin's, to negotiate the hiring of Slomin's as subrogors' new oil supplier.

22.     At no point during either meeting with Mr. Crichton did Angel, or any other Slomin's employee, enter the subject property's basement or inspect the tank, or even ask to enter the basement or inspect the tank.

23.     On or about December 4, 2016, Angel electronically sent Mr. Crichton two single-page documents, including a "Notice of Cancellation" form (describing subrogors' right to cancel the contract within three business days) and a "Guaranteed Fixed Heating Oil Pricing Agreement" electronically signed by Mr. Crichton (describing the hiring of Slomin's to deliver oil to subject property). *See the Slomin's 12/4/16 Notice of Cancellation and Guaranteed Fixed Heating Oil Pricing Agreement attached hereto as Exhibit "D."*

24.     At approximately 9:30 a.m. on December 13, 2016, a Slomin's employee arrived at the subject property with an oil-delivery truck and began filling subrogors' oil tank via the outside fill pipe located on the exterior of the house; this delivery is reflected on a receipt provided by Slomin's after said delivery. *See the 1/18/17 Account Summary attached hereto as Exhibit "E."*) (indicating Slomin's delivered 182.0 gallons of heating oil on December 13, 2016).

25.     The Slomin's employee did not inspect the tank prior to filling it via the outside fill pipe, either to confirm its structural integrity, or the amount of heating oil already in the tank.

26.     Mr. Crichton was home at the time the oil delivery commenced, working in his office on the first floor of the subject property.

27.     At approximately 10:30 a.m., one hour after delivery of the heating oil began, Mr. Crichton noticed the smell of oil coming from the downstairs of the subject property.

28.     At first, Mr. Crichton chose to ignore the smell, believing that it was a normal consequence of Slomin's having filled the tank.

29.     However, after a short time had passed wherein the smell did not dissipate, Mr. Crichton walked down into the basement, where he found that the oil-room within the basement flooded with oil.

30.    By the time Mr. Crichton learned of the oil spill, the Slomin's employee had already completed the delivery and left the subject property.

31.    Mr. Crichton immediately telephoned Slomin's to notify it of the problem; in reply, a Slomin's representative stated that the company would "send people out."

32.    Immediately after telephoning Slomin's, by way of notifying his insurer of the incident, Mr. Crichton called a claims representative employed by Plaintiff named Jeff Lewis.

33.    About an hour after making these phone calls, at which time Slomin's still had not arrived back at the house, Mr. Crichton noticed outside his window that the small creek running through the subrogors' backyard had turned red.

34.    In the United States, heating oil is customarily dyed red in order to prevent motorists from using it as diesel fuel and avoiding state and federal fuel taxes.

35.    Based upon this fact and his observation of the nearby creek, Mr. Crichton realized that the oil that had flooded his basement had now spread throughout his entire backyard and into the nearby waterway.

36.    Realizing the oil spill was far more serious than he initially realized, Mr. Crichton called Plaintiff again; he also called 911, and again called Slomin's, notifying them more urgently that the company had to send someone out to the subject property.

37.    Only after the second call to Slomin's, at which point the local fire department was already on scene and beginning to attempt cleanup, did a Slomin's representative come to observe the damage and attempt to assist.

38.    The oil spill / release complained of was a direct result of the negligence, recklessness and/or otherwise unlawful action and/or inaction of Defendants.

39.     As a direct result of the negligence, recklessness and/or otherwise unlawful action and/or inaction of Defendants, subrogors suffered damages to their real and personal property, and the imposition of additional expenses and hardship besides.

40.     Defendants directly and proximately caused the oil spill / release, as is further described below.

41.     To the extent subrogors' insurance policy covered these damages, Plaintiff paid claim monies to them consistent with the policy's terms and conditions; as a result, Plaintiff became subrogated to the claims asserted in this action.

## COUNT I – NEGLIGENCE
## PLAINTIFF v. SLOMIN'S

42.     Plaintiff repeats the allegations set forth in the prior paragraphs of this Complaint as though they were set forth at length herein.

43.     The aforementioned damages were the direct and proximate result of the negligence and carelessness of Slomin's, by and through its employees, agents, technicians, vendors, subcontractors, and/or servants, more specifically described as follows:

    a.    failing to exercise reasonable care in the following manner:

        i)    failing to properly and adequately analyse, supervise, monitor and/or manage the service of the tank, and its handling thereafter, so as to prevent this loss;

        ii)    creating, maintaining or permitting to be maintained a hazardous and/or dangerously defective condition of the tank;

        iii)    failing to take adequate measures to ensure that the tank was in a safe and proper working condition before filling it with oil;

        iv)    failing to take necessary precautions to protect the subrogors and others by remediating, marking, fixing notifying and/or otherwise alerting the subrogors concerning the existence of

the aforementioned unsafe condition involving the tank; and/or

v)          failing to have the tank properly inspected and/or tested to make sure that it safely functioned.

b.      failing to adequately instruct, supervise and/or train employees and agents as to the proper ways to perform the tasks set forth in subparagraph (a);

c.      failing to adequately warn the subrogors and others of the dangers and hazards resulting from the conduct set forth in subparagraph (a) above;

d.      failing to provide, establish, and/or follow proper and adequate controls to ensure the proper performance of the tasks set forth in subparagraph (a) above;

e.      failing to properly monitor the work of all agents and/or employees during the service, inspection, maintenance, and/or upkeep of the tank to ensure it was safe and in compliance with applicable safety standards; and/or

f.      failing to retain competent, qualified and/or able agents, employees or servants to perform the tasks set forth in subparagraph (a) above.

44.     As a direct and proximate result of the above-described incident, subrogors made claims on their applicable insurance policy; pursuant to the terms and conditions of said policy, Plaintiff made payments to and/or on behalf of subrogors.

45.     As a result of the payments it made to the subrogors and pursuant to the terms and conditions of the subrogors' policy, Plaintiff became subrogated to the recovery rights of subrogors asserted herein.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants, jointly, severally, and/or in the alternative, in an amount in excess of $100,000.00, plus costs incident to this suit, delay damages and for such other relief as this Honorable Court shall deem appropriate under the circumstances.

## COUNT II – BREACH OF WARRANTIES
## PLAINTIFF v. SLOMIN'S

46.     Plaintiff repeats the allegations set forth in the prior paragraphs of this
Complaint as though they were set forth at length herein.

47.     In furtherance of the aforementioned services performed, Slomin's impliedly
warranted that all work performed would be done in a reasonably workmanlike manner, and/or
with quality workmanship.

48.     Based upon the aforementioned improper conduct on the part of Slomin's, and
through its servants, employees, and/or agents as set forth above, Slomin's breached these
warranties.

49.     As a direct and proximate result of the above-described incident, and pursuant to
the terms and conditions of the subrogors' policy, Plaintiff made payments to, and/or on behalf
of the subrogors.

50.     As a result of the payments it made to the subrogors and pursuant to the terms and
conditions of the subrogors' policy, Plaintiff became subrogated to the rights of the subrogors to
the extent of its payments.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in
its favor and against Defendants jointly, severally, and/or in the alternative, in an amount in
excess of $100,000.00, plus costs incident to this suit, delay damages and for such other relief as
this Honorable Court shall deem appropriate under the circumstances.

## COUNT III – BREACH OF CONTRACT
## PLAINTIFF vs. SLOMIN'S, INC.

51.     Plaintiff repeats the allegations set forth in the prior paragraphs of this

Complaint as though they were set forth at length herein.

52.     Subrogor Christopher Crichton entered an enforceable agreement with Slomin's, indicated by the "Notice of Cancellation" and "Guaranteed Fixed Heating Oil Pricing Agreement." *See Exhibit D.*

53.     Further, Mrs. Crichton was an intended third party beneficiary to said agreement, in lieu of the fact that she equally resided at the residence and was Christopher Crichton's wife.

54.     This agreement provided that Slomin's would deliver heating oil to the subject property for twelve months at a fixed per unit price. *See Exhibit D.*

55.     An implicit term of this contract was that Slomin's would deliver heating oil in a safe manner. Relatedly, Slomin's was obligated by the implicit terms of the contract to inspect subrogors' heating oil tank before filling it to make sure that is could safely hold heating oil.

56.     In failing to inspect the heating oil tank beforehand, failing to use appropriate care in delivering the heating oil on December 13, 2016, and failing to quickly come back and attempt to remedy the problem when notified, Slomin's conduct fell below that which was required by its contract.

57.     As a direct and proximate result of the tank-leak incident, and pursuant to the terms and conditions of the subrogors' policy, Plaintiff made payments to, and/or on behalf of the subrogors.

58.     As a result of the payments it made to the subrogors and pursuant to the terms and conditions of the subrogors' policy, Plaintiff became subrogated to the rights of the subrogors to the extent of its payments.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants jointly, severally, and/or in the alternative, in an amount in excess of $100,000.00, plus costs incident to this suit, delay damages and for such other relief as this Honorable Court shall deem appropriate under the circumstances.

**COUNT IV – BREACH OF CONTRACT**
**PLAINTIFF VS. HORIZON SERVICES (PA) LLC**

59.    Plaintiff repeats the allegations set forth in the prior paragraphs of this Complaint as though they were set forth at length herein.

60.    In February of 2016, Horizon entered into a series of agreements with subrogors for the inspection and replacement of their residential heating oil system.

61.    As part of those agreements, Horizon explicitly promised to make sure that the entire system was in "safe operating condition" to provide subrogors with "peace of mind."

62.    Horizon violated that contractual obligation, contributing to the damages that ensued on December 13, 2016, because the oil spill occurred as a result of deterioration or other defects to the fuel tank that were noticeable ahead of time.

63.    As a direct and proximate result of the tank-leak incident, and pursuant to the terms and conditions of the subrogors' policy, Plaintiff made payments to, and/or on behalf of the subrogors.

64.    As a result of the payments it made to the subrogors and pursuant to the terms and conditions of the subrogors' policy, Plaintiff is subrogated to the rights of the subrogors to the extent of its payments.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants jointly, severally, and/or in the alternative, in an amount in

excess of $100,000.00, plus costs incident to this suit, delay damages and for such other relief as this Honorable Court shall deem appropriate under the circumstances.

## COUNT V – NEGLIGENCE
### PLAINTIFF v. HORIZON

65.     Plaintiff repeats the allegations set forth in the prior paragraphs of this Complaint as though they were set forth at length herein.

66.     The aforementioned damages were the direct and proximate result of the negligence and carelessness of Horizon, by and through its employees, agents, technicians, vendors, subcontractors, and/or servants, more specifically described as follows:

    a.    failing to exercise reasonable care in the following manner:

        i)    failing to take necessary precautions to protect the subrogors and others by remediating, marking, fixing notifying and/or otherwise alerting the subrogors concerning the existence of the aforementioned unsafe condition involving the tank; and

        ii)    failing to have the tank properly inspected and/or tested to make sure that it safely functioned.

    b.    failing to adequately instruct, supervise and/or train employees and agents as to the proper ways to perform the tasks set forth in subparagraph (a);

    c.    failing to adequately warn the subrogors and others of the dangers and hazards resulting from the conduct set forth in subparagraph (a) above;

    d.    failing to provide, establish, and/or follow proper and adequate controls to ensure the proper performance of the tasks set forth in subparagraph (a) above;

    e.    failing to retain competent, qualified and/or able agents, employees or servants to perform the tasks set forth in subparagraph (a) above.

67.     As a direct and proximate result of the above-described incident, and pursuant to the terms and conditions of the subrogors' policy, Plaintiff made payments to, and/or on behalf of subrogors.

68. As a result of the payments it made to the subrogors and pursuant to the terms and conditions of the subrogors' policy, Plaintiff became subrogated to the rights of the subrogors to the extent of its payments.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants, jointly, severally, and/or in the alternative, in an amount in excess of $100,000.00, plus costs incident to this suit, delay damages and for such other relief as this Honorable Court shall deem appropriate under the circumstances.

**COUNT VI – BREACH OF WARRANTIES
PLAINTIFF v. HORIZONS**

69. Plaintiff repeats the allegations set forth in the prior paragraphs of this Complaint as though they were set forth at length herein.

70. In furtherance of the aforementioned services performed, Horizon had impliedly warranted that all work performed would be done in a reasonably workmanlike manner, and/or with quality workmanship.

71. Based upon the aforementioned improper conduct on the part of Horizon, and through its servants, employees, and/or agents as set forth above, Horizon breached these warranties.

72. As a direct and proximate result of the above-described incident, and pursuant to the terms and conditions of the subrogors' policy, Plaintiff made payments to, and/or on behalf of the subrogors.

73. As a result of the payments it made to the subrogors and pursuant to the terms and conditions of the subrogors' policy, Plaintiff is subrogated to the rights of the subrogors to the extent of its payments.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants, jointly, severally, and/or in the alternative, in an amount in excess of $100,000.00, plus costs incident to this suit, delay damages and

                                              **de LUCA LEVINE LLC**

                              BY: _____
                                        DANIEL J. de LUCA
                                        ATTORNEY FOR PLAINTIFF
                                        PA Bar No. 74727
                                        Attorneys for Plaintiff
                                        Three Valley Square, Suite 220
                                        Blue Bell, PA 19422
                                        Ph: (215) 383-0166
                                        Fx: (215) 383-0082
                                        ddeluca@delucalevine.com

**Dated:** February 28, 2018